Lawrence V. Roughan v. Commissioner.
Roughan v. Commissioner
Docket No. 22328.
United States Tax Court
1952 Tax Ct. Memo LEXIS 345; 11 T.C.M. (CCH) 69; T.C.M. (RIA) 52019; January 25, 1952
*345 Lee I. Park, Esq., C. F. Rothenburg, Esq., and Howard T. Mather, Esq., for the petitioner. James C. Maddox, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in petitioner's income tax for the calendar years 1944 and 1945 in the respective amounts of $218,762.80 and $63,816.75. The question is whether the income of an alleged family partnership is to be taxed entirely to petitioner. The parties have filed a stipulation of fact with annexed exhibits; in addition, the testimony of several witnesses was taken. Findings of Fact The facts stipulated are hereby found, and the stipulation and accompanying exhibits are incorporated herein by reference. Petitioner is an individual residing at Frederick, Maryland. His tax returns for the periods in question, made on a calendar year basis, were filed with the collector of internal revenue for the district of Maryland. Petitioner was born in 1893 in Chicago, Illinois, one of five children of William J. Rowan and Elizabeth Rowan. He married his wife, Nettie, at Toledo, Ohio, in 1913, and they have one son, James, who was born in 1920. Petitioner's parents, *346 at a sacrifice, assisted him in going through business school during 1909, 1910, and 1911, and petitioner has always felt grateful to them. Thereafter petitioner worked as a stenographer or secretary, an office manager, and an accountant. For a brief period petitioner and his wife operated a restaurant and small hotel, in which they invested $600 or $700; this business failed and the investment was lost. During 1921 and 1922, Nettie earned about $2,000 working as a telephone operator, $500 of this amount was used to make a down payment on a home bought in Toledo, title to which was then held in her name, and the remainder was used for their living expenses. Two sisters of Nettie lived with them at this Toledo home while they were attending business college, and after they finished this schooling, they paid $13 per week for two or three years for room and board at the Toledo home. Petitioner and Nettie never earmarked or segregated their respective funds; they always regarded all their funds as jointly owned, and deposited and merged them in a joint bank account. In October 1943, Nettie owned personal property consisting of household furnishings, jewelry, clothing, and other items *347 worth a total of about $1,500. Petitioner's personal property, including an automobile, at that time had a realizable value of about $1,500. In addition, there was at that time a balance of about $2,500 to $3,000 in a joint account which had been opened on July 1, 1938, in the names of "L.V. or Nettie Roughan" in the Commercial Savings Bank at Adrian, Michigan. Most of the deposits in this account through December 10, 1943, represented salary received by petitioner. Some of the remaining deposits were as follows: (1) a deposit of $1,350 on November 13, 1941, representing the proceeds from the sale of the home in Toledo, Ohio; (2) a deposit of $3,024 on March 13, 1943, representing the proceeds from the sale of stock in Schwarze Electric Corporation, part of which had been acquired with funds from the joint account; (3) a deposit of $675 on December 10, 1943, representing proceeds from the sale of rugs used in the Toledo home, which had been acquired from the joint account. In October 1943 petitioner's father and mother were about 75 and 71 years of age respectively. At that time they owned and lived in a home at Toledo, Ohio, in which they had resided for about thirty years. For *348 ten years prior to 1926, petitioner's father had been a pipefitter, but he incurred an injury which forced him to retire in that year. After 1926 he dealt in real estate, and by November 1943 he had sold all except two lots in a subdivision of land bought by him outside Toledo. Petitioner's parents also received money from relatives who paid rent for room and board at the parents' home. On November 1, 1943, in addition to that home, petitioner's father owned a house and lot worth not less than $3,000, cash in the approximate amount of $500, and household effects and personal property. From 1938 to October 1943 petitioner worked for Schwarze Electric Corporation (and its successor, a limited partnership) at Adrian, Michigan, which manufactured horns, bells, and other automotive articles. He had a minority stock interest in the corporation. On January 25, 1943, a group of individuals from Chicago Messrs. Doroshaw, Kleinman and Ackerman (also referred to herein as the "Chicago group") bought a majority of the stock in Schwarze Electric Corporation. They were in no way related to petitioner or any member of his family. In February 1943, the Chicago group bought the assets and liabilities *349 of Schwarze Electric Corporation, which was then dissolved, and those assets and liabilities were transferred to a limited partnership formed by them, called Schwarze Electric Company. During his first three years with Schwarze, petitioner worked on a salary basis; thereafter he received a salary and a bonus. At the insistence of the majority of stockholders who were selling out to the Chicago group, petitioner, on January 25, 1943, was given a new employment contract with Schwarze by the Chicago group. It provided for a fixed salary of $625 per month plus a bonus. On March 20, 1943, the employment contract was amended, because of war-time regulation of salaries and wages, to provide for a maximum bonus of $8,500 per year. Prior to the agreement with the Chicago group, petitioner's maximum compensation from Schwarze had been about $6,000 per year. Prior to his connection with Schwarze, when he worked as an accountant, his maximum compensation had been $3,600 to $4,000 per year. Despite the salary increase they gave him, relations between petitioner and the Chicago group were strained, because he had opposed their acquisition of the Schwarze stock. Moreover, the Chicago group felt *350 that petitioner was not operating the business in accordance with their policies. In the latter part of August 1943, they asked him to take a vacation and advised him that his next assignment would be Frederick, Maryland. The Chicago group had obtained an option to acquire the stock of Price Brothers, Inc., located at Frederick, which manufactured controls and relays of various types for electronic devices, and which had large subcontracts for war supplies. While on this vacation, petitioner was given various papers and data for study pertaining to Price Brothers, Inc. In September 1943, when the Chicago group was ready to buy the stock of Price Brothers, Inc., they asked petitioner to go to Frederick to represent them. He was also to represent them in Philadelphia, where they hoped to acquire another plant manufacturing relays; they also planned to acquire such a plant on the Pacific coast. After the Chicago group's purchase of the stock of Price Brothers, Inc., petitioner was left in Frederick to keep them informed about the business, to supervise its finances, and to familiarize himself with the business. During this period petitioner was called to Chicago from time to time for *351 consultation and to receive instructions. The Chicago group was unsuccessful in acquiring a relay plant in Philadelphia, and as a result lost interest in Price Brothers, Inc. They were aware that petitioner had been looking for a business, and suggested that he buy the Price enterprise. The Chicago group preferred to keep control of the Price corporation, but to sell certain of its assets (which will be referred to collectively as the Price "business"). Petitioner discussed with his wife, son, father and mother the purchase of this business, and their "joining" in it. Their response was "enthusiastic". Because of his feeling of obligation to his parents for providing him with schooling, petitioner wanted at that time, as he had theretofore, to do something for them. At that time the son, James, was in his last year at the school of engineering of the University of Michigan, and was facing induction into the armed forces. Up to that time he had been a chemical engineering student, but he then took some courses in electrical engineering. James at that time had no property other than clothing and personal effects of negligible value. On or about November 10, 1943, an instrument, *352 dated November 1, 1943, was executed by petitioner, his son, his parents, and Nettie, which stated that they were forming a limited partnership under Maryland law, for a term of five years starting November 1, 1943, and with the name of Price Brothers Company. The instrument provided further that petitioner was the sole "general partner", with all the others only "limited partners"; that the "limited partners" were to take no part in the management or control of the business; that the "partnership" capital was $17,500, with $3,500 contributed by each "partner"; that the interest of each "partner", general or limited, and the share of each in the profits and losses was 20 per cent, except that "the share of the limited partners in the losses of the business shall in no event exceed in the aggregate the amount of their respective contributions" to the "partnership"; that during continuance of the "partnership", no "limited partner" was entitled to withdraw any part of his share of the capital; that the partnership was to end on the death, retirement or insanity of the "general partner", but not of a "limited partner". On November 20, 1943, the same parties executed a supplement to *353 this instrument providing that petitioner was to "be entitled, for services in connection with the conduct of the business, to a salary of $18,000.00 per annum, payable monthly, before determination of partnership profits available for distribution among the partners". A second supplement executed on November 1, 1944, increased this salary to $25,000 per year beginning November 1, 1944. Petitioner's salary was increased because he felt "I was worth more". A certificate of limited partnership for Price Brothers Company was filed in the office of the clerk of the circuit court for Frederick County, Maryland, on November 10, 1943. In that certificate Nettie's and petitioner's address was given as Frederick, Maryland; their son's, as Ann Arbor, Michigan; petitioner's parents', as Toledo, Ohio. The above-mentioned capital contribution of $3,500, declared to be made by each of these persons, was reflected by a demand promissory note in that amount executed by each of them to Price Brothers Company as payee and dated November 1, 1943. On or about February 12, 1943, $1,600 was credited against each of these notes, or a total of $8,000, which was furnished by petitioner under the following *354 circumstances: On or about October 23, 1943, petitioner and Schwarze Electric Company entered into an agreement terminating the employment contract of January 25, 1943, Schwarze agreeing to pay $8,000 net (after income and victory tax withholdings in the amount of $2,000) to petitioner in return for a complete release by petitioner. The settlement of this employment agreement and the purchase of the Price business were interdependent: petitioner was willing to give such a release and to settle for $8,000 net only because he was given the opportunity to buy the Price business; it was part of the transaction that any amount, for which the employment agreement was settled, would in turn be paid towards purchase of the Price business; and the Chicago group represented to petitioner that they would enable him to buy the Price business with the cash he had in bank plus such money as was owing him under the employment agreement with Schwarze. On November 12, 1943, Schwarze issued a check to petitioner for $8,000, which petitioner immediately endorsed over to Price Brothers, Inc., in connection with the purchase of the latter's assets, described herein. This was the $8,000 that was treated *355 as payment on the foregoing notes. The negotiations for the sale of the assets of Price Brothers, Inc., had been completed at about this time. On November 12, 1943, a written agreement was executed by Price Brothers, Inc., as seller, and Price Brothers Company, as buyer, in which the former agreed to sell its accounts receivable, inventory, fixed assets, and certain prepaid charges for a total of $169,910.03. The purchase price was to be paid by $94,193.86 in cash and three promissory notes for the balance, due on December 31, 1943 and secured by a purchase money mortgage, in the amounts of $44,302.66, $12,275.63 and $19,137.88. The buyer agreed, as part of the total purchase price, to assume and hold the seller harmless of certain described liabilities of the seller. It was provided that the transaction was to be consummated "as of" October 30, 1943. It was agreed that the buyer would have the right to use the name "Price Brothers", and that the seller would change its name, which it thereafter did to "Victory Products And Manufacturing Corporation". The agreement was signed for the buyer only by petitioner as "general partner". On November 12, 1943, the buyer also agreed, in *356 a separate document in the form of a letter signed by petitioner as "general partner", to protect the seller against liability on renegotiation of any of its contracts with the Federal Government, and to deposit $12,500 in escrow for that purpose. At the end of this document there appeared an acknowledgement by the escrow agent of receipt of the sum of $12,500. Such amount as may have been put in escrow was unconditionally turned over to the seller by the escrow agent on or about May 19, 1945. This escrow amount was regarded as an addition to the purchase price of $169,910.03, increasing it to $182,410.03, and was attributed to an increase in the price of the inventory. The Price business was purchased pursuant to this agreement. Pursuant to plan, the purchase was financed through a purchase money mortgage, bank loans, and conversion of assets of the Price business. The only cash, used in making the purchase, which came originally from any of the "partners", was the above-mentioned $8,000 for which petitioner settled his employment agreement with Schwarze. The remaining cash used in making the purchase came from bank loans and money realized from the assets and operations of the *357 purchased business. At that time the business could have been operated on a sounder margin, if there were invested additional funds of $25,000 to $50,000, but none of the partners made any contribution of capital to meet this condition. The opening balance sheet of Price Brothers Company, as of November 1, 1943, showed a net worth, recorded as "Partners' Capital Accounts", of $103,174.90. Inventories were carried at $85,513.40, including an appreciation in value of $31,286.23, and fixed assets were carried at $74,376.84, including an appreciation in value of $54,388.67. The amounts so shown on the balance sheet represented the value of those assets at that time. This aggregate appreciation in value, amounting to $85,674.90, was included in the foregoing figure for the "Partners' Capital Accounts". The entire purchase from Price Brothers, Inc., was considered by petitioner to be a "bargain". As to the $3,500 notes given by each party to the "limited partnership" agreement of November 1943, there remained outstanding, after the credit of $1,600 described above, a balance of $1,900 on each note. On October 31, 1944, this balance, or a total of $9,500, was fully paid out of the business *358 profits of Price Brothers Company. None of the "partners" contributed any services to Price Brothers Company during 1944 and 1945 other than petitioner. Other than petitioner, none of the "partners" exercised any control over or participated in the operation or management of Price Brothers Company during these years. Of all the "partners", only petitioner had the power to sign checks, drawing on the funds of the business. Petitioner would not have entered into a partnership with strangers, to carry on the business of Price Brothers Company, in the same circumstances in which he purported to enter into a partnership with his wife, his son, and his parents. On January 22, 1944, James, while attending college, was inducted into the United States Navy. While he was in college and in the Navy, he was sent copies of technical catalogues and financial statements of Price Brothers Company. Petitioner also informed him of engineering difficulties Price Brothers Company was having, and urged James to do his utmost with his time at school so that he would provide the greatest service after coming into the business. James was discharged from the Navy on February 5, 1946; he resumed his *359 studies at the University of Michigan in the spring of 1946 and was graduated in August of that year. Upon graduation he became active in the conduct of the business of Price Brothers Corporation, a Maryland corporation which, on December 31, 1945, succeeded to the business of Price Brothers Company. On March 11, 1944, petitioner and Nettie jointly bought a residence in Frederick for $19,500, as tenants by the entirety. They made payment therefor out of withdrawals in the aggregate amount of $22,000 from the profits of Price Brothers Company: each withdrew $5,000 on March 13, 1944, and $6,000 on April 8, 1944. Thereafter Nettie also withdrew $2,000 from the business to buy a lot adjoining this residence. On April 16, 1945, petitioner's parents deeded to petitioner title to their home in Toledo. The parents thereafter continued to live at that home, and paid real estate taxes with respect to that property. After closing their joint bank account at Adrian, Michigan, petitioner and Nettie opened a joint account at Frederick. Petitioner also opened personal accounts in his own name at Frederick. James also had a separate account at Frederick, and funds deposited in this account, *360 in amounts of $100 to $200 per month, were from Price Brothers Company. While James was in the service, petitioner had a power of attorney to withdraw from this account, and did so in small amounts for James' benefit. On December 31, 1945, the business and assets of Price Brothers Company were transferred to a newly formed Maryland corporation, Price Electric Corporation. At that time the following credit balances appeared in capital accounts on the books of Price Brothers Company: petitioner - $65,655.33; Nettie - $62,537.88; James - $75,425.23; Wm. J. Rowan - $75,164.89; Eliz. Rowan - $74,575.24. The stock of Price Electric Corporation, to the nearest $100 unit, was issued to these persons in the amounts of these balances. From the time of its organization to December 31, 1945, the business of Price Brothers Company, continuing the manufacture of relays and controls for electronic devices, was carried on at Frederick. During this period, the entire operations of the business were concerned directly or indirectly with work for the armed forces, which was subject to cancellation upon cessation of hostilities. Funds to finance the operation of the business were often obtained by *361 bank loans secured by accounts receivable. Books of account for Price Brothers Company were regularly kept, for a fiscal year ending October 31 and on the accrual basis of accounting. After deduction of the salary allowed to petitioner as stated above, the books of Price Brothers Company showed a net profit of $307,374.62 for the year ending October 31, 1944, a profit of $112,520.08 for the year ending October 31, 1945, and a net loss of $24,785.70 for the period November 1 to December 31, 1945. For the same periods, partnership tax returns were filed which showed, respectively, net income of $513,936.71, [1] net income of $145,832.27, and a net loss of $19,821.32. For the first two of these periods, on the books of Price Brothers Company there was credited to each party to the "limited partnership" agreement, income of $61,474.92 and $22,504.02, respectively, and to each party there was a debited loss of $4,957.14 for the last period. Withdrawals from Price Brothers Company *362 during November 1, 1943, to October 31, 1944, were as follows after petitioner was paid his agreed salary: Withdrawn
to Pay
Other
Total
Personal
With-
With-
Taxes
drawals
drawals
Petitioner
$26,124.22
$19,028.68 [2]
$45,152.90
Nettie
15,007.00
15,500.00 [2]
30,507.00
James
15,007.00
2,950.00
17,957.00
Wm. J. Rowan
15,007.00
1,000.00
16,007.00
Eliz. Rowan
15,007.00
1,100.00
16,107.00 Of the withdrawals made for the period November 1, 1944, to December 31 1945, the following amounts were for purposes other than payment of the personal taxes of the withdrawing parties: petitioner - $9,100; Nettie - $2,675; James - $2,250; Wm. J. Rowan - $4,550; Eliz. Rowan - $4,950. None of the withdrawals by William J. and Elizabeth Rowan were ever deposited in the personal accounts of petitioner or Nettie; none of the withdrawals by persons other than petitioner were used to pay personal *363 obligations of petitioner. The "limited partners" filed income tax returns for the calendar years 1944 and 1945 on which the only income reported was income from Price Brothers Company. Those returns showed the following gross income and reported the following taxes as due: 1944
1945
Income
Tax
Income
Tax
Petitioner
$117,187.34
$83,796.32
$48,535.55
$24,300.81
Nettie
99,187.34
68,660.95
19,368.85
6,360.94
James
99,187.34
68,688.61
19,368.85
6,426.30
Wm. J. Rowan
99,187.34
68,688.61
19,368.85
6,338.85
Eliz. Rowan
99,187.35
68,688.61
19,368.85
6,426.30 The tax paid for 1945 was as stated above. For 1944, the tax was reduced because of renegotiation of the income of Price Brothers Company for that year; for 1944 the following tax was paid: petitioner - $48,319.11; Nettie - $34,860.47; James - $34,884.44; Wm. J. Rowan - $34,884.43; Eliz. Rowan - $34,884.43. Petitioner's tax returns for 1944 and 1945 were adjusted by respondent so as to attribute to him the entire income of Price Brothers Company. Petitioner, his wife, his son and his parents did not in 1944 and 1945 intend, in good faith and with a business purpose, *364 to join together for the purpose of carrying on as a partnership the business known as Price Brothers Company. Opinion RAUM, Judge: In 1943 petitioner was given the opportunity of buying a rather substantial business in Frederick, Maryland, at a bargain price and with a net outlay of but little cash. Such cash as might be needed to make the purchase was readily available to petitioner, and, while the business might have operated more soundly with an investment of additional funds, such cash as might thereafter be required in the operation of the business could be obtained, as it in fact was, on the security of assets of the business in the course of its operation. In conjunction with taking advantage of this opportunity, petitioner formed a "partnership" under Maryland law with his wife, his son, and his parents, and the business was acquired in the name of the partnership. This partnership, Price Brothers Company, was a limited one, in which petitioner was the only designated "general partner" and all the others were denominated "limited partners". As such, petitioner had complete and sole control over the management and operation of the business, and the other persons had none *365 whatever. Indeed, none of the others was in a position to provide any service to the business during the years in question. Petitioner's parents were 75 and 71 years old; they lived in Ohio, away from the business; and there was nothing to show that they had any substantial suitable business experience. Petitioner's son. during the years in question, was away from home either at college or in the Navy, and although the technical schooling he was then receiving or would receive in the future might make him an asset to the business at some later time, that time had not yet come. [3] There was no showing that petitioner's wife was equipped by experience or training to render any service of importance to the business. Nor did these persons, other than petitioner, in any way make a financial contribution which *366 assisted in acquisition of the business or its later operation during the years in question. Their capital contributions to the business consisted only of their promissory notes for $3,500 each, and the "limited partners" contributed no cash or other property of their own in payment of those notes.[4]Partial payment of the notes of the "limited partners" was considered to have been made by attributing to them portions of an $8,000 payment made to petitioner on an obligation owed him by those who controlled the seller of the business; and the balance of the notes was satisfied from later profits of the business. Although the business could have operated on firmer ground with additional capital, the "limited partners" neither contributed it nor seemed to be in a position to do so. Moreover, as "limited partners", their independent assets were not subjected to the hazards of the business and for all practical purposes they risked nothing in it, the so-called partnership agreement providing that their share "in the losses of the business shall in no event exceed in the aggregate the amount of their respective contributions" of $3,500. The business profits appeared to be little more *367 subject to their dominion than the operation of the business. The business made handsome profits during its fiscal years ending in 1944 and 1945, showing on its books respective net profits of $307,374.62 and $112,520.08, and on its tax returns respective net incomes of $513,936.71 and $145,832.27. Yet only a small part of these profits was distributed to the limited partners for any purpose other than payment of the taxes with respect to such profits. It may well be that various business considerations required retention of profits in the business. The fact remains, however, that petitioner continued to receive a return from the business at least in the form of an annual salary, which was first set at $18,000 and then raised to $25,000, while the other "partners" derived little independent financial benefit from the shares of the "partnership" attributed to them. In these and the remaining circumstances found by us, the Commissioner refused to recognize the "partnership" for tax purposes, and determined that the entire business income was taxable to petitioner. The validity of that determination is the question before us. We think Commissioner must be sustained. We do not question, *368 and respondent concedes, that the formalities prescribed by Maryland law for the creation of a partnership, were satisfied. And undoubtedly parties can intend to join in a business venture and can genuinely form a business partnership, and a limited one, which will be effective for tax purposes. That is not what we find to have been done here, however. On all the evidence and all the facts before us as to the years in question, we think that the alleged partners did not really and truly intend to engage in a joint business venture and to carry on business as partners during the tax years in controversy. ; ; ; (C.A. 5), certiorari denied, - U.S. - (November 13, 1951); (C.A. 9), affirming ; (C.A. 4). The income of the business during the taxable years was attributable to the petitioner and must be taxed to him. Such an intent was lacking not only *369 as to the parents, but as to the son and wife as well. The evidence shows, regarding the son, no more than an intent on petitioner's part to join in business with him at some future time when he finshed his schooling, returned from the Navy, and was ready to start his vocation. Before that time the son was practicially propertyless, lacked experience or training, and found himself in circumstances which prevented his participation in the business. Cf. . So far as the wife was concerned, the fact that she and petitioner commingled their funds, or even that some of those funds might have gone into the business, does not establish her as his business partner. There are many couples who consider their marriage as a venture in partnership living, and accordingly treat their possessions and property as belonging to a common fund. This does not, however, make them partners in a particular enterprise either for business or tax purposes. Petitioner argues that there was no "reallocation" of income tax-wise because the partnership "acquired a new business in which the petitioner had no interest and from which, therefore, he had no *370 income to reallocate within the family group". While it may be that the acquisition of a new business contemporaneously with the formation of the partnership is a relevant consideration, it is not necessarily a pivotal one. For, it is wholly possible that a prospective purchaser of a business may have sufficient foresight to anticipate substantial returns therefrom and may deliberately undertake in the first instance to channel the profits, through a partnership arrangemeent, to members of his immediate family. And whether such partnership will be recognized for tax purposes depends upon the application of the principles announced and applied in the Lusthaus, Tower, and Culbertson decisions. In the present case, petitioner knew that he was making a highly advantageous purchase. Although it was speculative in character, he was undoubtedly aware of the possibilities of handsome returns therefrom. The only cash actually invested by the purchaser was the foregoing $8,000 due to petitioner from his former employer. The so-called limited partners, in reality, contributed nothing that was not already available. Their $3,500 notes were of no genuine significance. To the extent of $1,600 each, *371 these notes were discharged by allocating against them the foregoing $8,000 payment. And as to the remaining $1,900 on each note, there does not appear to have been any real expectation that such amount would be paid other than out of the profits of the business itself. We think that, in the language of the Culbertson opinion, , petitioner and the members of his family did not "in good faith and acting with a business purpose" intend "to join together in the present conduct of the enterprise." Nor is the situation changed by reason of the fact that petitioner undertook to establish a "limited" partnership within the framework of Maryland law. Of course, a limited partnership may be given effect taxwise, where there is a genuine contribution of capital by the limited partners. But we have no such contribution here, and the very nature of the limited partnership prohibited them from participating in the conduct of the business. Cf. . The absence of vital services is plainly a relevant consideration, and the mere fact that petitioner has made certain, by contract, that the other parties would have no *372 hand in running the affairs of the business surely does not place him upon a stronger footing. Taking all the facts into account, we are satisfied that the Commissioner's determination must be upheld. After trial of this case, Congress enacted the Revenue Act of 1951 which, in Section 340 thereof, deals with family partnerships by adding Section 191 and amending Section 3797 (a) (2) of the Code. We need not consider the effect of the new provisions, since they are made applicable only to taxable years beginning after December 31, 1950, and in view of the express direction in the enacting section that "the determination as to whether a person shall be recognized as a partner for income tax purposes for any taxable year beginning before January 1, 1951, shall be made as if this section had not been enacted and without inferences drawn from the fact that this section is not expressly made applicable with respect to taxable years beginning before January 1, 1951." Decision will be entered for the respondent. Footnotes
1. The difference between the net income shown on the returns and the net income on the books is based upon a renegotiation reserve and other items of deduction not taken into account in the returns.↩
2. Petitioner's withdrawals consisted in part of $11,000 withdrawn to buy the Frederick home. Similarly, $11,000 of Nettie's withdrawals was to pay for the Frederick home. Another $2,000 of Nettie's withdrawals was used to buy the lot adjacent to that home.↩
3. Thus, petitioner testified that, while the son was at college and in the Navy, he "kept him informed of [the progress of the business and] other matters with which we were faced and the difficulties which we were having in our engineering department, and urging him to do the utmost with his time so that he could give us the greatest amount of service when he returned."↩
4. The unimportance of these notes as a source of capital for the business is reflected by petitioner's testimony that he "had called their [the parents'] attention to the fact that the note, of course, was an obligation, although I had tried not to embarrass them by indicating that when money was required to pay the note that somehow or another it would be provided by gift or otherwise".↩